[Civ. No. 27658. Second Dist., Div. Two. May 25, 1964.]

ART CONLEY et al., Plaintiffs and Respondents, v. JOHN C. FATE et al., Defendants and Appellants.

David Lynn for Defendants and Appellants.

Gibson & Hillsinger and Frank A. Hillsinger for Plaintiffs and Respondents.

ROTH, J.—Appellants (sellers) appeal from a judgment in favor of the respondents (purchasers) ordering specific performance of an alleged contract to convey two unimproved lots in the city of Lawndale.

The uncontradicted facts show that an alert real estate broker, Friestad, persuaded appellants to sign a "deposit receipt" which, among other things, provided: "Received from Art Conley . . . herein called the 'BUYER' the sum of $500 as a deposit on account of the purchase price of the following described property. . . ." The purchase price was $10,000 payable as follows: "Cash: two thousand five hundred including deposit. Buyer to execute a building loan not to exceed $65,000. Seller to carry a second trust deed and note for ($7,500.00) payable $75.00 per month including 6% interest all due on or before 7 years. Payments on second T.D. to start 90 days after escrow has closed. Buyer has the wright [sic] to approve or disapprove the CC&Rs within 2 weeks. Seller retains all oil wrights [sic] 500 feet below the surface." It was further agreed that "escrow shall be opened not later than five (5) days after acceptance of this offer at BOULEVARD ESCROW Co. Escrow shall be sixty (60) days unless otherwise specified. . . . Deposit may be retained by Broker until required by escrow to complete transaction. ... Time is of the essence of this contract, but Broker may extend for a period of not to exceed one month the time for performance of any act hereunder, including the date of closing the escrow (except the time for the acceptance of this offer by Seller.) 11. In consideration for the services of the

Broker herein, this offer and any counter offer shall remain in effect and irrevocable for a period of 1 days from the date hereof to allow Broker to procure Buyer's and Seller's approval.''

The deposit receipt referred to was by Friestad presented to and signed by appellants on April 26, 1962, without request or solicitation by appellants.

Conley was another real estate broker who developed vacant property. It was this same Conley who, together with Katherine Conley, his wife, were named as purchasers, although at the time the deposit receipt was submitted to and signed by appellants, Friestad had no commitment from the Conleys or anyone else, but as he had previously done business with Art Conley, Friestad testified that he had Art Conley in mind.

Having obtained appellants' signatures to the deposit receipt, Friestad contacted Conley the following morning, who liked what he saw, and undertook to compensate Friestad upon the consummation of the deal in the amount of $1,000. Friestad and Conley proceeded that same morning to open an escrow at Hawthorne Savings and Loan, which named appellants as sellers and Conley and wife as purchasers. Respondents, however, did not pay the $500 as required by the deposit receipt to Friestad, the broker, or deposit it in the escrow, nor did they deposit the $2,000. The proposed loan of $65,000 was referred to in the instructions in the identical language used in the deposit receipt. Conley and Friestad took away three copies of the proposed instructions, one for each, and the other to be presented by Friestad to appellants for their signature.

Friestad submitted the escrow instructions to appellants who did not sign allegedly because the $500 and the $2,000 had not been deposited in the escrow and for other alleged reasons, such as that the deposit receipt ran to Art Conley as purchaser whereas in the escrow instructions the purchasers were named as Art and Katherine Conley, the receipt had named Boulevard Escrow Co. as the escrow, whereas the escrow selected was Hawthorne Savings and Loan; the receipt provided for a 60-day escrow, the escrow instructions for a 61-day escrow, and because of other differences, all trivial, between the receipt and the proposed escrow instructions.

No money was deposited in the escrow by the Conleys, or anyone else until May 15 when $500 was deposited. The $2,000 mentioned in the remaining portion of the $2,500 in

the receipt and in the proposed escrow instructions, was never deposited in the escrow.

The receipt specifically required that the terms of the offer it contained were to remain in effect and were to be irrevocable for one day. Acceptance of such offer within the one-day period required the deposit of $500 on account, either with Friestad the broker, or in escrow. Respondents did not make this deposit. Wholly aside from the other differences between the receipt and the instructions, since no deposit was made by respondents until May 15, the deposit of $500 on May 15, did not meet the requirements of the receipt. The most that can be said for such deposit made by respondents is that they made a counter-offer on May 15. Appellants, however, did not accept this counter-offer. There was no contract. (*Simons Brick Co.* v. *Wiglesworth,* 184 Cal. 390, 391 [193 P. 947, 19 A.L.R. 1029]; *Callisch* v. *Farnham,* 83 Cal.App.2d 427, 430 [188 P.2d 775].)

Assuming there was a contract, such contract predicated on uncontradicted facts cannot be specifically enforced.

It is elementary that a court of equity will not exercise its power to specifically enforce a contract, the terms of which are indefinite and uncertain. (*Colorado Corp., Ltd.* v. *Smith,* 121 Cal.App.2d 374, 376 [263 P.2d 79]; *Goehring* v. *Stockton Morris Plan Co.,* 93 Cal.App.2d 417 [209 P.2d 41]; *Gould* v. *Callan,* 127 Cal.App.2d 1, 4 [273 P.2d 93]; 45 Cal. Jur.2d 269; *Roven* v. *Miller,* 168 Cal.App.2d 391, 397 [335 P.2d 1035].)

The deposit receipt and the instructions make it clear that there was to be a " ... building loan not to exceed $65,000" and that the $7,500 balance of purchase price remaining to be paid to sellers was to be in the form of a note secured by a purchase money trust deed which trust deed was to be subordinate to the building loan. However, neither the receipt nor the instructions set forth any detail in respect of the proposed $65,000 "building loan." Each instrument is implicit with the suggestion that the building loan was to be secured by a first encumbrance on appellants' property and that appellants were obligating themselves to take a purchase money trust deed as a second. The receipt and the instructions are completely blank as to what type of structure or structures were to be constructed on the property with the approximate $65,000 to be borrowed. No plans or specifications are referred to as in being nor are plans or specifications otherwise identified. Each, the receipt and the instruc-

tions, is silent as to whether there would be one structure or more, whether the structure would be a residence or a business, whether such structure or structures would be one purpose or multipurpose, nothing is said about the number of square feet and in no way is the type of projected building operation delineated. Each, the receipt and the instructions, is silent as to the rate of interest to be paid on the approximate $65,000; as to whether or not a fee or any discount points were to be permitted in negotiating for the loan, whether or not the loan was to be amortized in any way, and if so, what was the rate of amortization. In short, the alleged contract is hopelessly uncertain.

Assuming as we must that appellants knowingly permitted a $65,000 loan to precede the security of the balance to be due to them on the purchase price, the obligation of respondents to secure a construction loan not to exceed $65,000 was obviously an essential element of the contract. The nature of this building loan and what was to be built, was or should have been of substantial interest to the appellants. It secured the value of the land upon which the second trust deed is based. (*Colorado Corp., Ltd.* v. *Smith, supra.*) In *Smith,* the court says at page 376 : "A court must be able to say what is the stipulated performance [Citations.] 'A promise to erect buildings where the dimensions and plans are not specified, or which refers to plans and specifications as a part of a contract though no plans and specifications are attached, ... "are all too vague," and are not of "sufficient definiteness" ... to be "enforceable." ' ' ' "

In *Gould, supra* at page 3, the contract of conveyance provided for a $45,000 second deed of trust and contained the following provision, "The 2nd Trust Deed ... to provide for subordination on the following basis: In the event the trustor [plaintiff] should erect a building on subject property at a total building cost of not less than $75,000 or more than $300,000, then Beneficiary agrees to subordinate said Trust Deed to the lien of a first trust deed not to exceed 60% of the true building cost." The court held at page 4: "A contract for the sale of realty will not be specifically enforced unless it not only contains all the material terms, but also expresses each in a reasonably definite manner. [Citations.] This general principle has been applied in denying specific enforcement of contracts which were incomplete, indefinite or uncertain, with respect to the terms of payment of deferred balances or the terms of the encumbrances representing such deferred balances. [Citations.] Uncertainty as to the terms

and conditions of deferred payments is fatal to a claim for specific performance. [Citations.]"

It is obvious that the trial court had nothing before it in the way of a contract which can be specifically enforced.

■ Speaking specifically in respect of the necessity for complete certainty with respect to a subordination clause such as is projected in the case at bar, the court in *Gould, supra,* at pages 4 and 5 says the following:

"The subordination provision is incomplete in its statement of the obligation to be secured by the first deed of trust. It is silent as to the amount of interest, the length of time it is to run, and the terms of payment. . . .

"If something is reserved for the future agreement of both parties, the promise can give rise to no legal obligation until such future agreement. Since either party, by the very terms of the promise, may refuse to agree to anything to which the other party will agree, it is impossible for the law to affix any obligation to such promise. (*Ridgway* v. *Chase,* 122 Cal.App. 2d 840, 849 [265 P.2d 603].)"

■ It seems clear that there is nothing before the court which it can specifically enforce.

Judgment is reversed and cause remanded to the trial court with directions to enter judgment in favor of appellants, costs to be borne by respondents.

Herndon, Acting P. J., and Ashburn, J.,* concurred.

---

*Retired Justice of the District Court of Appeal sitting under assignment by the Chairman of the Judicial Council.