[Civ. No. 45745. Second Dist., Div. Five. May 12, 1976.]

S. JON KREEDMAN & COMPANY,
Plaintiff, Cross-defendant and Appellant, v.
MEYERS BROTHERS PARKING-WESTERN CORPORATION,
Defendant, Cross-complainant and Appellant;
WESTGAGE-CALIFORNIA REALTY COMPANY,
Cross-defendant and Appellant.

174

**COUNSEL**

Loeb & Loeb, Robert A. Holtzman and Edward S. Labowitz for Plaintiff, Cross-defendant and Appellant.

Nossaman, Waters, Krueger, Marsh & Riordan, Nossaman, Waters, Krueger & Marsh, Richard R. Mainland, James A. Hamilton and Richard D. Fybel for Defendant, Cross-complainant and Appellant.

Hanna & Morton, Harold C. Morton, Bela G. Lugosi, Lauren R. Brainard and Michael C. Mitchell for Cross-defendant and Appellant.

## OPINION

**KAUS, P. J.**—This dispute involves the construction and lease of a parking structure adjacent to the One Wilshire Building. The parties are S. Jon Kreedman & Co., a developer; Meyers Brothers Parking-Western Corporation, which leases and operates public parking garages, and Westgate-California Realty Company, also a developer. Kreedman filed a declaratory relief action against Meyers, which in turn filed a cross-complaint against Kreedman and Westgate. After a court trial, the court found in favor of Meyers, and awarded damages in the amount of $556,000, which, on new trial motions by Kreedman and Westgate, it reduced to $241,000. Kreedman and Westgate appeal from the judgment against them, and Meyers appeals from the reduced judgment in its favor.

For convenience, Kreedman and Westgate are sometimes referred to as "Plaintiffs" and Meyers, as "Defendant."

### FACTS[1]

The property involved in this case is a parcel, used as a parking lot just south of the One Wilshire building, on which Kreedman had a 99-year lease. In May 1966, Kreedman and Meyers entered into a written lease under which Kreedman agreed to construct a parking structure on the property and to lease it to Meyers for 26 years with renewal options totalling an additional 25 years.

The lease, with attachments, is 30 pages long and is mainly a standard commercial lease under which Kreedman leased to defendant a parking garage "to be constructed. . . ." The lease provided that Kreedman would "proceed diligently" with the "construction of a parking garage . . . in accordance with the Plans," with a completion date of July 1, 1969. The lease further provided that the garage "shall be constructed in accordance with certain plans, drawings and specifications (the 'Plans' herein) which have been signed by the parties and are incorporated in and made a part of this Lease and which are referred to as exhibit

---

[1]The record in this case consists of 3,878 pages of reporter's transcript; 610 pages of clerk's transcript; and a carton of exhibits. Kreedman and Westgate, in their opening brief of 154 pages and a reply brief of 42 pages, state every disputed fact to support a judgment they did not obtain. The statement of facts is, therefore, based on those set forth in Meyers' brief, which facts are supported by the record.

' "B." ' " However, when the lease was signed the "plans, drawings and specifications" did not exist.

Both Kreedman and defendant knew that the reference to the "plans . . ." was inaccurate but they did not change the lease. Instead they entered into a contemporaneous letter agreement which provided: "Concurrently herewith, we are executing a lease . . . with you. . . . [¶] You [Meyers] understand and acknowledge that the execution and delivery to you of the Annex Lease is contingent upon (a) approval by each of us of preliminary plans for the parking garage to be constructed on the Annex property . . . [and] that final plans . . . shall be substantially in accord therewith . . . and (b) our obtaining interim and permanent financing for the improvements on the Annex property satisfactory to us in all respects." The letter agreement also provided that if the two stated conditions were not satisfied by December 1, 1966, Kreedman would have the right to terminate the lease. "Satisfactory financing" was defined in another paragraph of the letter agreement.

Included in the 1966 lease were the following provisions relevant to this case:

First, if the garage was not substantially completed by July 1, 1969 and the failure to complete it was not due to unavoidable delay, Meyers "may" terminate the lease "and all rights and duties of [Meyers] hereunder shall cease and terminate."

Second, there was a fixed annual rent, payable in monthly installments of about $12,500, with a reduction in rent "at the rate of $317.50 for every car space less than 425 car spaces."

Third, the structure would have nine levels above ground and two levels underground. Entrances and exits would be to and from Grand Avenue. The structure would have space for uses other than a garage; however, Meyers would use the premises only for parking.

When the lease was executed, Meyers and Kreedman expressly agreed that neither party would unreasonably withhold approval of plans depicting the basic structure called for by the 1966 lease.

The "preliminary plans" referred to in the letter agreement were prepared by Johnson and Neilsen in January 1967. Kreedman "particu-

larly liked" the Johnson and Neilsen plans. Meyers did not object to those plans and apparently approved them.[2]

The garage was never built under the 1966 lease. However, Kreedman and Meyers through letter amendments extended the time for Kreedman's termination option.

In 1967, Kreedman started negotiations with Westgate for the sale of Kreedman's interest in the lease. Westgate would construct the garage. It planned to use the commercial space in the garage as a branch office of the United States National Bank. The contract that resulted consisted of the following: First, a sale by Kreedman of his interest in the property to Westgate for $400,000. Second, a lease, dated in December 1967, between Westgate and Kreedman, under which Westgate as "Landlord" would build the parking garage and lease it to Kreedman on substantially the same terms as Kreedman had leased it to Meyers. Third, a sub-lease between Kreedman and Meyers dated December 1967 which incorporated most of the provisions of the original lease. Both the Westgate-Kreedman lease and Kreedman-Meyers sublease contained the same reference to the "certain plans, drawings and specification . . ." *still nonexistent.*

Westgate's attorney, noting that the drafts of both the lease and the sublease contained the premature reference to the plans, drawings and specifications, asked Kreedman's attorney to revise the leases to reflect the actual facts. Although Kreedman's lawyer inserted "exterior elevations" this language was not inserted in the sublease and the erroneous reference was contained in the final versions because of "time pressure" in closing the transaction. However, Kreedman repeatedly assured Westgate that Kreedman would not unreasonably withhold approval of plans; that Kreedman "would approve any plans that were reasonable," and that Kreedman would "approve anything that Meyers Bros. would accept."

---

[2]Plaintiffs contend, contrary to the findings of the trial court, that Meyers never approved any set of plans. In a somewhat ambiguous letter dated December 12, 1967, Kreedman wrote to Meyers: "It is further understood that [we] . . . will cooperate to the fullest extent possible in approving plans for the garage which will contain not less than 440 car spaces, provided that said garage not cost more operationally to run and may be operated as efficiently *as the garage plans heretofore approved by you,* . . ." (Italics added.) The trial court was, of course, entitled to infer from this letter that defendant had, in fact, approved the Johnson and Neilsen plans.

Starting in about November 1967, Westgate hired its own architects, Wheeler & Associates, to work on plans for the garage. That firm prepared a series of schemes in 1968; of these, only one, scheme "D," was shown to Meyers, who was generally satisfied with it. Kreedman said "Get the project under way. I will approve whatever is reasonable." However, Westgate ordered a halt to all work on the project in September 1968.

Meyers made demands on Kreedman and Kreedman made demands on Westgate that the structure be built. By February 1969, Kreedman was threatening Westgate with legal action. Finally, in the spring of 1969, Westgate put the Wheeler firm back to work and the so-called "Ninth Scheme" design for the garage was developed. In April 1969, Westgate advised Kreedman that "we plan to commence ground breaking approximately July 1, 1969, . . ." With some changes, the ninth scheme was approved by Westgate, Kreedman and Meyers. The Wheeler firm continued to work on the plans incorporating changes proposed by Meyers. On August 6, the Wheeler firm submitted a revised set of drawings to Meyers. Then on August 7 Westgate instructed Wheeler to stop work on the project.

In August 1969, Kreedman and Westgate decided to amend the lease and sublease to provide for only a three-level subterranean garage to be connected to the existing One Wilshire garage, and a surface bank building. This proposal was presented to Meyers. Meantime, Kreedman borrowed a substantial amount of money from the United States National Bank, owned by Westgate. In November 1969, Meyers rejected the proposed amendment to the lease. That month, Kreedman and Westgate decided that the lease and sublease were unenforceable because of the false reference to "plans, drawings and specifications" and refused to construct the parking structure described in those documents.

Facts will be added in the discussion.

## DISCUSSION

The core of plaintiffs' contentions is that the lease was "merely an unenforceable agreement to agree." Plaintiffs' arguments are all without merit.

■ First, plaintiffs' relying on *Donnelly* v. *Adams,* 115 Cal. 129 [46 P. 916], assert that extrinsic evidence was inadmissible to prove the agreement because the parties "lied" in stating that specifications existed and were incorporated into the lease when they did not. *Donnelly* did indeed hold that parol evidence was inadmissible to explain the omission of signed specifications from a contract where there was a "false reference in a written contract" to such specifications. (115 Cal. at p. 131.) Assuming, arguendo, that *Donnelly* has any life left in it (see *Masterson* v. *Sine,* 68 Cal.2d 222, 226 [65 Cal.Rptr. 545, 436 P.2d 561]), in this case the contract did not consist only of the 1966 lease with the premature reference as in *Donnelly,* but the lease as modified by the contemporaneous letter agreement which referred to the lease. The 1967 sublease was, even more so, one document of a package.

■ Plaintiffs next contend that the failure of the parties to provide for plans and specifications means as a matter of law that the contract was not "sufficiently definite and certain to give rise to a legal obligation." That contention, too, is without merit. We emphasize that this case involves an agreement to build a parking structure, not a palace. The various cases relied on by plaintiffs in which the importance of specifications was stressed all involve structures to be used by people, not cars, and therefore have only limited applicability. (E.g., *Robinson & Wilson, Inc.* v. *Stone,* 35 Cal.App.3d 396, 409 [110 Cal.Rptr. 675] [medical suites]; *Conley* v. *Fate,* 227 Cal.App.2d 418, 421 [38 Cal.Rptr. 680] [building loan]; *Colorado Corp., Ltd.* v. *Smith,* 121 Cal.App.2d 374, 376-377 [263 P.2d 79] [residences]; *Bravo* v. *Sharkey,* 97 Cal.App.2d 883, 885-886 [218 P.2d 785] [commercial building]; *Kerr Glass Corp.* v. *Elizabeth Arden Corp.,* 61 Cal.App.2d 55 [141 P.2d 938] [commercial building]; *King Lumber Co.* v. *National Bank* (4th Cir. 1923) 286 F. 906, 908 [bank building].)

Moreover, even if the same standards of specificity applicable to structures for human occupancy applied to parking structures, the cases simply do not support the rule that specifications are a *sine qua non* of an enforceable contract.

The cases involving specific performance (*Conley* v. *Fate, supra,* 227 Cal.App.2d 418; *Gould* v. *Callan,* 127 Cal.App.2d 1 [273 P.2d 93]) do not help plaintiffs, since many agreements which are not subject to specific performance because of a lack of specificity may nonetheless provide the

basis for a damage action. (*Totty* v. *Azevedo*, 128 Cal.App.2d 167, 171 [275 P.2d 59].) Besides, in *Conley*, the contract was "completely blank as to what type of structure or structures were to be constructed" (227 Cal.App.2d at p. 421), and in *Gould*, the parties failed to state the amount of interest and repayment plan in a building sale and loan transaction. (127 Cal.App.2d at p. 6.)

The other cases are no more helpful to plaintiffs. Thus, in *King Lumber Co.* v. *National Bank, supra*, 286 F. 906, 908, the court found fatally defective, not merely the absence of plans and specifications, but the lack of "any definite description of the building agreed on by the parties." Similarly, in *Colorado Corp., Ltd.* v. *Smith, supra*, 121 Cal.App.2d 374, 377, the contract was "silent as to the size . . . , type, location, cost, appearance, or any other details of construction" of the residences. In *Bravo* v. *Sharkey, supra*, 97 Cal.App.2d 883, 885-886, the contract not only omitted plans and specifications, but stated only that the prospective lessees were "desirous" of leasing the property provided that the plaintiffs proceeded to remodel it. And in *Kerr Glass Corp.* v. *Elizabeth Arden Corp., supra*, 61 Cal.App.2d 55, although the parties, as in this case, failed to attach plans and specifications to the lease, in contrast to this case nothing in *Kerr Glass* suggests that the lease contained any description whatsoever of the building.

Plaintiffs rely chiefly on *Robinson & Wilson, Inc.* v. *Stone, supra*, 35 Cal.App.3d 396. There, it was only after a contractor apparently promised to complete the interior of a medical building for some $30,000 based on plans and specifications to be prepared, that the owners made commitments to various doctors to lease space in the undesigned area. (35 Cal.App.3d at pp. 400-401.) The court held that the clause was not sufficiently definite and certain to give rise to a legal obligation: "Absent plans and specifications, an agreement to provide labor and materials for the completion of 'standard' or 'minimal' medical suites is too indefinite and uncertain to evidence a meeting of the minds respecting the scope of the work or to provide an objective basis for assessment of damages." (*Id.*, at p. 407.)

*Robinson & Wilson* is significantly different from this case. There, the contractor's promise to build standard or minimal medical suites was made for physicians whose needs were not and could not have been known when the agreement was made. Here, the garage was for one of

the contracting parties and Kreedman's promise was based on requirements known to him. More important, here the agreement provided the parties with a list of details defining the parking structure.

The parties, as noted above, agreed that the parking structure would, with allowance for easements on either side, fill a specified lot; would consist of nine levels above ground and two levels below ground; would have entrances and exits from the subterranean levels to the adjoining number One Wilshire Building garage; would have exits and entrances to the above ground levels from and to Grand Avenue; would contain about 425 spaces with a yearly rental reduction if it contained fewer parking spaces, and would contain commercial establishments on the first floor and part of the second floor.

Plaintiffs, in enumerating those items that were not covered by the documents, proceed from mistaken factual and legal assumptions. Thus, that the contract did not cover "the building construction and the materials to be utilized," possibly significant if Meyers had been buying the building, would be of much less moment in a lease, particularly where, as here, plaintiffs were responsible for structural repairs. Plaintiffs predictably cite no authority for their novel assumption that the enforceability of a contract depends upon its profitability or that a contract to be enforceable must be complete in all respects.

The cases make clear that the specificity required for an enforceable contract depends upon the circumstances. Thus, in *Coleman Engineering Co.* v. *North American Aviation, Inc.,* 65 Cal.2d 396 [55 Cal.Rptr. 1, 420 P.2d 713]—inexplicably relied on by plaintiffs—the court found an enforceable contract (65 Cal.2d at pp. 405-406) notwithstanding the dissent's assertion that neither "design specifications, price, nor time of performance have been agreed upon, . . . and the parties extended negotiations demonstrate that they deemed both the specifications and price to be essential." (*Id.,* at p. 417.)

In *Bettancourt* v. *Gilroy Theatre Co., Inc.,* 120 Cal.App.2d 364 [261 P.2d 351], the court found a contract to build a "First class Theatre" (*id.,* at p. 366) sufficiently definite and certain to create and impose a contractual obligation because the expression "first class theatre" enabled the defendant "to know what it had undertaken to do . . . ." (*Id.,* at p. 369.) In *Mason* v. *Ennes,* 172 Cal.App.2d 99 [342 P.2d 79], the court

found enforceable an agreement involving the construction of a building 30 by 70 feet in which the materials were specified, the building was to conform to the local building code requirements and was to be of a type that would accommodate a trucking business (*id.,* at pp. 100-101). Finally, in *Rivers v. Beadle,* 183 Cal.App.2d 691 [7 Cal.Rptr. 170], the court found sufficiently certain a contract involving the construction of "a speculative home" on three lots (*id.,* at p. 697).

Plaintiffs place great weight on the fact that the parking structure was not to be built until all the parties had approved plans, drawings and specifications. There is, of course, nothing unusual in a contract containing a right of prior approval, which is construed as implying a covenant of reasonableness (e.g., *Rubin v. Toberman,* 226 Cal.App.2d 319, 327 [38 Cal.Rptr. 32]). Thus, plaintiffs' complaint that the contract was uncertain because approval of the parties was necessary is a recasting of their argument that the contract was uncertain because it lacked plans and specifications.

Plaintiffs also challenge many of the 19. pages of factual findings made by the trial court. The challenge to the findings reflects only plaintiffs' complaint that the trial court should have resolved evidentiary conflicts and drawn inferences in their favor.

Thus, contrary to plaintiffs' contentions, there is nothing unreasonable or illogical in the trial court finding that the parties agreed that none of them could unreasonably withhold approval to plans that comported with the features of the garage as outlined in the original lease, or that no party could unreasonably withhold approval simply because that party had concluded that the agreement "had become economically unfeasible or unprofitable . . ." And, even if the trial court's interpretation requires that the parking facilities be "reasonably efficient and operable" only from Meyers' point of view, we fail to see what is necessarily unreasonable or illogical about that. The cost of constructing the garage was not Meyers' problem; it was, after all, only renting it from plaintiffs. The original lease and the subsequent sublease are, however, fairly specific with respect to the rent payable to plaintiffs and the manner in which it would be affected by Meyers' income. For example, as noted, the original lease and the sublease specifically provide for a reduction in rental of $317.50 for every space less than 425 car spaces that the garage contained. In brief, plaintiffs are confusing profitability to them with enforceability.

Plaintiffs also contend that the trial court erred in finding that Meyers relied substantially and to its detriment on the 1967 sublease by consenting to the termination of the 1966 lease, executing the sublease, accepting construction of the annex garage by Westgate instead of Kreedman, consenting to the assignment of the lease by Kreedman to Westgate, and accepting a "Declaration of Attornment" from Westgate, made as "part of the consideration inducing Meyers" to execute the sublease. Plaintiffs, again substituting indignation for reason, state that it is "incredible that any of the foregoing, or all of the foregoing taken together, can be characterized a substantial detrimental reliance." Once again, the "reason" that the terminated lease was not a contract for the benefit of Meyers according to plaintiffs is that there was no agreement. That, of course, is taken care of by our discussion above.

■ Finally, plaintiffs assert that Meyers had no remedy in damages in the event of a breach. They contend that the provision in the sublease which provided that if the garage were not substantially completed by July 1, 1969, Meyers "may" terminate "and all rights and duties of Tenant hereunder shall cease and terminate," provided Meyers' exclusive remedy. The contention is without merit. Meyers did not elect to terminate the lease; it sued for breach of it. (Compare *B. C. Richter Contracting Co.* v. *Continental Cas. Co.,* 230 Cal.App.3d 491, 501 [41 Cal.Rptr. 98], cited by plaintiffs.)

## DAMAGES

The trial court found that Meyers had been damaged in the total amount of $555,927—later cut in half, an issue discussed below—which amount represented lost profits proximately caused by the material breaches of the lease and the sublease by plaintiffs.

■ Plaintiffs' contention that the *exclusive* measure of damages in a landlord-tenant dispute is always the difference between the agreed rent and the rental value of the premises is without merit. (E.g., *Hoag* v. *Jenan,* 86 Cal.App.2d 556, 563-564 [195 P.2d 451].)

■ Plaintiffs then contend that loss of profits to an unestablished business is too uncertain and speculative to support an award of damages. The rule is, however, "not a hard and fast one." (*Gerwin* v. *Southeastern Cal. Assn. of Seventh Day Adventists,* 14 Cal.App.3d 209, 221 [92 Cal.Rptr. 111].) The issue is, rather, whether the damages can be

calculated with reasonable certainty. (*Grupe* v. *Glick,* 26 Cal.2d 680, 693 [160 P.2d 832].)

First, and most obviously, although this particular parking garage was new, the parking business is, as the trial court noted in its memorandum opinion, not a new business and Meyers "was a highly experienced garage operator . . . ." Moreover, as the trial court also pointed out, the operation of a parking garage is a relatively simple operation with sufficiently few decision points to make a prediction of profits reasonably possible.

With respect to the evidence, it is sufficient to note that Meyers' expert, Philip Stukin, a land economist employed by Economics Research Associates, concluded based on feasibility studies and the evidence developed at the trial that the parking garage, had it been constructed, would have been a very profitable operation for Meyers. In addition, Fred Riscen, a longtime employee of Meyers, testified concerning the profitability of the subterranean garage in the One Wilshire Building already operated by Meyers.

Plaintiffs, of course, assert that the trial court believed the wrong experts and point out that their expert, H. Lee Carter, testified that a garage he operated for Continental Auto Parks on Spring Street was doing poorly and another garage at Eighth and Hill Streets recently went into bankruptcy. The trial court could have believed Carter's version of profitability; it chose not to do so.

There is no point in detailing plaintiffs' dissatisfaction with Stukin's overall approach. The correctness of his assumptions concerning the occupancy factor in the office buildings, the number of employees, the projected transient usage and so forth, were obviously fact questions resolved against plaintiffs by the trial court.

Plaintiffs' complaint that the study involved impermissible proof by mathematics is without merit. We are aware of no case, and plaintiffs cite none, involving the determination of damages in a civil case in which the use of projections has been held to be impermissible. Indeed, the use of such projections is, as plaintiffs appear to recognize, routine in calculating, for example, the present value of future damages.

In brief, plaintiffs' appeal has no merit.

CROSS-APPEAL

Judgment in favor of Meyers was entered on February 6, 1974. Kreedman and Westgate then filed a written motion for a new trial on various grounds, including "newly discovered evidence." They requested that the court take judicial notice of "the existence of a catastrophic energy crisis in the Los Angeles area and generally in and throughout the United States, which has manifested itself, among other things, in the inability of automobile drivers to obtain adequate supplies of gasoline, a significant reduction in the use of private automobiles and a consequent diminution in the use of public automobile parking facilities."

The motion for a new trial was argued on March 20, 1974. On April 10, 1974, the trial court filed a written ruling in which it denied the new trial, but amended the findings and judgment under section 662 of the Code of Civil Procedure. To aid counsel and—specifically—this court, the trial court explained that "[t]he foundation for the alterations of the findings and judgment is predicated on the energy crisis precipitated by the Middle East petroleum boycott. It appears to the Court that the short-term energy crisis has become a long-term energy problem. Assuming that the court may take judicial notice of such events occurring after trial, the energy crisis created a condition in the automotive and automobile parking business that interferes and prevents this Court from computing and fixing damages for any period of time beyond January 1, 1974 with that degree of certainty required by the law. Fixing future damages under the energy crisis shadow would fall into the realm of conjecture, speculation and uncertainty."

■ The trial court's original findings had set forth the expected net profits from the operations of the garage on a fiscal year basis, starting July 1, 1969, and ending July 1, 1978.[3] In conformity with its view on the effect of the energy crisis, the trial court then amended the original findings to reflect its opinion that any damage after January 1, 1974 would be speculative. This change reduced the original judgment by more than half.

Under section 662 of the Code of Civil Procedure the trial court could, of course, "in lieu of granting a new trial, . . . vacate and set aside the

---

[3] The trial court had found that the first year would have resulted in a loss of almost $18,000.

findings and judgment and reopen the case for further proceedings and the introduction of additional evidence . . . ." Nevertheless, as section 662 expressly provides, the court may only do so "on such terms as may be just, . . ."

As we analyze the record, the motion for a new trial was argued on March 20, 1974, and taken under submission. The court then took judicial notice of the energy crisis—thereby reopening the case for further proceedings—but immediately closed those proceedings without having given Meyers an opportunity to prove or disprove the effect of the matter judicially noticed.

The problem is not whether the trial court could take judicial notice of the energy crisis,[4] but whether, having taken judicial notice, it acted "on such terms as may be just." The ultimate question was not whether there was an energy crisis but how that crisis affected the damages which Meyers had previously proved to the court's satisfaction.

Meyers' cross-appeal therefore has merit. There need not, however, be an entire new trial on the issue of damages. The carefully drawn findings by the trial court make it possible for us to limit the scope of the retrial to the precise dimensions of the error. On remand, therefore, the only issue to be tried shall be the expected profits from the garage operation from January 1, 1974 to and including July 1, 1978.

The judgment is affirmed in all respects except to the extent that it does not allow damages in excess of $230,571. Costs on both appeals are awarded to the respondents and appellants Meyers Bros.

Stephens, J., and Hastings, J., concurred.

Petitions for a rehearing were denied June 10, 1976, and the petitions of appellants Meyers and Westgage for a hearing by the Supreme Court were denied July 8, 1976. Mosk, J., did not participate therein.

---

[4]For what it is worth we take judicial notice that two days before the matter was submitted, on March 18, 1974, the Arab nations, in effect, announced that they were lifting the oil embargo against the United States.