57 Cal.Rptr.3d 187 (2007)
149 Cal.App.4th 529
PARLOUR ENTERPRISES, INC., et al., Plaintiffs and Respondents,
v.
The KIRIN GROUP, INC., et al., Defendants and Appellants.
No. G036525.
Court of Appeal of California, Fourth District, Division Three.
April 6, 2007.
*189 Law Offices of William B. Hanley, William B. Hanley, Newport Beach; and Gerald N. Shelley, Costa Mesa, for Defendants and Appellants.
Smith, Chapman & Campbell, Steven C. Smith, William D. Chapman, and Robert J. Hadlock, Santa Ana, for Plaintiffs and Respondents.

*188 OPINION
RYLAARSDAM, J.
A jury awarded plaintiffs Parlour Enterprises, Inc. (Parlour), Fun Foods 1 (Fun Foods 1), LP, and Fun Foods Block, LP (Fun Foods Block) approximately $6.6 million in damages based upon contract and tort causes of action. The award consisted of lost profits, lost franchise fees, and consequential expenses sustained by plaintiffs when defendants unilaterally terminated the franchise agreement between them to develop subfranchises. Defendants, Herman Chan and his corporation, The Kirin Group, Inc. (Kirin) appeal, contending the damages awarded were improper because the evidence was unreliable. We agree with respect to the award of lost profits and lost franchise fees, but disagree as to the over $200,000 in expenditures incurred by plaintiffs to develop the subfranchises. The matter is remanded to the trial court with directions to reduce the award of damages to plaintiffs to $202,929. As modified, the judgment is affirmed.

FACTS AND PROCEDURAL BACKGROUND
From 1963 to 1972, Bob Farrell opened 55 Farrell's Ice Cream Parlours (Farrell's) around the United States. In 1972, he sold all of them to Marriott Corporation, which opened an additional 85 restaurants. Around 1980, Marriott sold the ice cream parlors only to take them back three years later. Marriott shut down all Farrell's operations in the mid-1980s, except for a single Farrell's operating in San Diego.
Chan, who had worked at a Farrell's Ice Cream Parlour as a teenager, formed a corporation, Kirin, and in 1996, bought the Farrell's trademarks and trade names. In November 1999, he opened a Farrell's in Temecula, California, but closed it in early 2002 because it was not profitable.
Before closing that Farrell's, Kirin entered into a series of written agreements with Parlour in 2000 to develop Farrell's subfranchises in California. The agreements consisted of an Area Development Agreement (ADA) and a rider to the ADA. The ADA gave Parlour the exclusive right to subfranchise Farrell's in California, subject to Kirin's written consent and except for Kirin's "reserving] to itself the right ... to: (a) itself, or through an Affiliate, own and operate `Farrell's Ice Cream Parlour Restaurants' which are located a minimum of two and a half (2) miles in any direction from an existing Restaurant or a Restaurant then under construction in accordance *190 with a Franchise Agreement or an approved Subfranchise Agreement[]...." Under the subfranchise agreements, Parlour was supposed to receive an up-front fee and royalties in the form of a percentage of the net sales.
The ADA required Parlour to open a minimum number of restaurants within a certain time period. Parlour ultimately opened only one store within the required time frame. In 2001, Parlour opened a Farrell's in Santa Clarita in the Mountasia Family Fun Center. Mountasia, a limited partnership that owns the Mountasia Family Fun Center, provided the funds by using cash flow and refinancing the property. Before then, Parlour had been unable to find any investors.
Parlour was also unable to find any investors in 2002 for additional restaurants. Accordingly, Parlour set up the limited partnerships of Fun Foods Block and Fun Foods 1 to fund the building of Farrell's at The Block in Orange and in Aliso Viejo respectively. For both limited partnerships, the limited partner investors were to contribute 100 percent of the funds. At some point, the limited partners contributed funds for the development of the sites.
Parlour requested an extension of time to open the second restaurant, resulting in a Settlement and Mutual Release Agreement signed in December 2002. Among other things, the agreement extended Parlour's time to open the second restaurant to December 2003. It also extended the time to open all subsequent restaurants by one year! In early 2003, the parties signed an Amendment to the Settlement Agreement.
In October 2003, Kirin terminated the ADA for failure to pay attorney fees it believed Parlour owed under the Amendment. Kirin claimed Parlour owed it "legal fees totaling $19,077.55 related to the ADA extension," which Parlour refused to pay.
Parlour, Fun Foods 1, and Fun Foods Block sued defendants. Parlour alleged claims for breach of contract, intentional fraud, negligent misrepresentation, and defamation. Fun Foods 1 and Fun Foods Block asserted a claim for interference with prospective business advantage.
At trial, plaintiffs' expert, Robert Wunderlich, testified to the amount of damages caused by defendants' conduct. He referenced eight locations in his analysis. Three of the locations, The Block, Aliso Viejo, and Fresno, had specific plans for opening restaurants at each location. For these, he calculated franchise fees to Parlour plus lost profits. For the one location already open, Santa Clarita, also called Mountasia, and the remaining four locations, Wunderlich assessed only franchise fees to Parlour. The franchise fees included a $35,000 up-front fee and royalties in the form of a percentage of the gross sales.
Projections provided by Parlour formed the starting point of his analysis for both on the franchise fees and lost profits. Wunderlich did not know who actually prepared the projections, or their education, training, or experience. But he knew the projections were prepared on behalf of Parlour's principals, whom he knew were "experienced in these sorts of businesses." If the projections had not already been prepared, Wunderlich would have had to prepare them. He also used these projections to determine expenses and "bench marked that by looking at actual expenses [and analyzing the financials of] the Santa Clarita location and in general for the industry." He did not use Parlour's projections for the first two years but rather allowed for a ramp-up time. "So the first two years have lower sales than actually was contained in this projection. And then *191 beyond the year 3, that's when [he] reached the stabilized period" and used the projections provided by Parlour.
In addition, "[he] obtained market data[ ] ... about a couple of dozen ice cream parlors." He looked at the publicly available data for one particularly large chain of restaurants called Friendly's, a publicly traded company which he believed "is relatively similar to the Farrell's concept." According to Wunderlich, Friendly's "is a chain of about 300 or so restaurants, which is similar to Farrell's in that it has both the ice cream end and the food end." The earnings projected by Parlour were lower than the Friendly's chain, which indicated to him that Parlour's projections were reasonable. He also considered "some projections from ice cream stores," but relied more on the data for Friendly's because it "had both the ice cream component and the food component, where the others were purely ice cream [parlors], smaller operations than ones which would be serving a full menu."
He further considered the two Farrell's that were open: one in Santa Clarita and one in San Diego. Regarding the San Diego Farrell's, he inquired to determine its revenues, expenses, and profits by speaking to Parlour's principals. He did not speak to anyone else to determine that restaurant's income and expenses. For Santa Clarita, the profit and loss statement covered the entire center, precluding Wunderlich from determining the restaurant's profit and loss from its operations alone. But he was able "do a rough appraisal" of the net profits by allocating or apportioning expenses and revenue. He did so by looking at line items and tagging some of the expenses as food-oriented or game-oriented and allocating the rest according to revenue. He determined "that the [Santa Clarita] restaurant was generating a positive profit when [he] did a reasonable allocation of the operating expenses to the restaurant." The sales from Santa Clarita were somewhat lower than plaintiffs' projections, which he concluded was because it did not receive stand-alone business but rather "most of its business tended to be from people already there at the arcade, as opposed to itself being a big attraction. [¶] And so in their view, the [Santa Clarita] location was not as attractive of a location as the other ones for which they had plans." For that reason, he did not use the actual Mountasia numbers as a starting point for his other estimates.
Wunderlich started with revenues and deducted expenses, such as labor, rent, insurance and other factors needed to run the business, to arrive at a net profit number. He divided the amount of damages suffered by plaintiffs into three categories: loss of "franchise fees" (one time fee plus a percentage of revenue), lost profits, and extra expenses incurred in implementing the ADA. He calculated that Parlour's lost franchise fees would be about $2.6 million, lost profits for The Block, Aliso Viejo, and Fresno locations would be about $3.9 million ($1.5 million for The Block, $785,000 for Aliso Viejo, and $1.7 million for Fresno), and the extra expenses incurred collectively by plaintiffs would be $202,929, for a total of about $6.7 million.
As to the lost franchise fees, Wunderlich took a percentage of the gross revenue, and added a "one-time flat fee," discounted to present value. According to Wunderlich, "franchise fees are based only on a percentage of revenue[s]o you don't have to consider expenses. You don't even have to consider profitability[. A]s long as the stores are open and earning revenue," Parlour would receive franchise fees.
For the $202,929 in extra expenses incurred, Wunderlich separated the expenses between Parlour, Fun Foods Block, *192 and Fun Foods 1. Using Parlour's bank account records, he added up the expenses that would be wasted expenses if it could not develop the locations, and that totaled $67,348. He did the same thing with Fun Foods Block and Fun Foods 1 and determined their extra expenses totaled $126,486 and $9,095, respectively. He concluded Parlour lost $2,606,927 in franchise fees, plus $67,348 in extra expenses, Fun Foods Block lost profits of $1,483,602, plus $126,486 in extra expenses, and Fun Foods 1 lost profits of $784,686, plus $9,095 in extra expenses.
A jury found in plaintiffs' favor on all causes of action except defamation. It awarded Parlour $4.25 million, Fun Foods 1 $785,000 and Fun Foods Block $1.6 million for a total of approximately $6.6 million. The trial court denied defendants' motions for judgment notwithstanding the verdict and for new trial. Subsequently, the court entered an order appointing a receiver and awarded attorney fees to plaintiffs.
After oral argument, plaintiffs filed a supplemental letter brief on issues raised by the court. We ordered the letter brief filed and allowed defendants an opportunity to file a letter brief in reply. Plaintiffs then filed a motion to strike portions of defendants' reply letter brief, to which defendants filed opposition. Subsequently, plaintiffs filed an application to file a reply to defendants' opposition. The motion to strike is denied. The application to file a reply to defendants' opposition is granted. We have considered all evidence presented by the parties.

DISCUSSION

1. Damages
Defendants contend the evidence was insufficient to support the award of lost profits because the expert opinion on which the award was based was "so speculative that the trial court should have excluded the opinion and ... the opinion cannot constitute substantial evidence to support the verdict." We agree.

a. General Legal Principles
"Damage awards in injury to business cases are based on net profits. [Citation.]" (Electronic Funds Solutions, LLC v. Murphy (2005) 134 Cal.App.4th 1161, 1180, 36 Cal.Rptr.3d 663.) "`"Net profits are the gains made from sales `after deducting the value of the labor, materials, rents, and all expenses, together with the interest of the capital employed.' [Citation.]' " [Citations.] A plaintiff must show loss of net pecuniary gain, not just loss of gross revenue. [Citations.]" (Kids' Universe v. In2Labs (2002) 95 Cal.App.4th 870, 884, 116 Cal.Rptr.2d 158 (Kids' Universe).
Where an established business's operation is prevented or interrupted, "`damages for the loss of prospective profits that otherwise might have been made from its operation are generally recoverable for the reason that their occurrence and extent may be ascertained with reasonable certainty from the past volume of business and other provable data relevant to the probable future sales. [Citations.]'" (Kids' Universe, supra, 95 Cal.App.4th at p. 883,116 Cal.Rptr.2d 158, citing Grupe v. Glick (1945) 26 Cal.2d 680, 692-693, 160 P.2d 832.) On the other hand, lost anticipated profits for an unestablished business whose operation is prevented or interrupted are generally not recoverable because their occurrence is uncertain, contingent and speculative. Nevertheless, they may be recovered "where the evidence makes reasonably certain their occurrence and extent.' [Citations.]" (Ibid. Certainty as to the amount is not required; reasonable certainty is sufficient. (Id. at pp. 883-884, *193 116 Cal.Rptr.2d 158.) These principles apply to both tort and contract cases. (Id. at p. 883,116 Cal.Rptr.2d 158.)
"`[I]f the business is a new one or if it is a speculative one ..., damages may be established with reasonable certainty with the aid of expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and the like.'" (Kids' Universe, supra, 95 Cal.App.4th at p. 884, 116 Cal.Rptr.2d 158.) "[T]he experience of similar businesses is one way to prove prospective profits. [Citations.] Also relevant is whether the market is an established one. [Citations.]" (Id. at p. 885, 116 Cal.Rptr.2d 158; see S. Jon Kreedman & Co. v. Meyers Bros. Parking-Western Corp. (1976) 58 Cal.App.3d 173, 184-185, 130 Cal.Rptr. 41.) "`A plaintiffs [or a third party's] prior experience in the same [or similar] business has been held to be probative [citations]; as has a plaintiffs [or a third party's] experience in the same [or similar] enterprise subsequent to the interference. [Citations.]'" (Kids' Universe, supra, 95 Cal.App.4th at p. 886, 116 Cal.Rptr.2d 158.) "`Similarly, prelitigation projections, particularly when prepared by the defendant, have also been approved. [Citation.] The underlying requirement for each of these types of evidence is a substantial similarity between the facts forming the basis of the profit projections and the business opportunity that was destroyed.' [Citation.]" (Ibid. "`"[E]xpert testimony alone is a sufficient basis for an award of lost profits in the new business context when the expert opinion is supported by tangible evidence with a `substantial and sufficient factual basis' rather than by mere `speculation and hypothetical situations.'" [Citations.]'" (Id. at p. 885,116 Cal.Rptr.2d 158.)
We apply these principles to plaintiffs' evidence with respect to their claims for lost profits, lost franchise fees, and consequential expenses.

b. Analysis

(1) Lost Profits

Wunderlich calculated lost profits for restaurants located in The Block, Aliso Viejo, and Fresno. These three restaurants had specific plans for opening, but are still unestablished businesses for which lost prospective profits are recoverable only "where the evidence makes reasonably certain their occurrence and extent.' [Citations.]" (Kids' Universe, supra, 95 Cal.App.4th at p. 883, 116 Cal.Rptr.2d 158.) We conclude the evidence does not make this showing.
Wunderlich's calculations for these three locations relied on projections provided by Parlour, market data about Friendly's and a couple of dozen other ice cream parlors, and the two open Farrell's. We discuss these in turn.

(a) Proforma Projections

Defendants criticize Wunderlich's calculations for relying on "groundless proforma projections." (Bold and capitalization omitted.) They contend the projections were speculative because they contained disclaimers stating the projections were "not based on actual operations," were not assured to "reflect actual results," and were "estimate[s] of start up expenses of the project." They further assert that Wunderlich "had no idea of the source of the projections (other than he received them from Parlour or its attorney). The expert did not know the qualifications, education or training, if any, of the person or persons preparing the projections or methodology used in preparing the projections." Defendant's contentions have merit.
The projections that formed the basis for Wunderlich's opinion were from an offering *194 circular prepared by Parlour and given to potential investors. They were not based on actual operations, but rather consisted of Parlour's assumptions over the next five years. Each contained disclaimers that the income and expense estimates may not reflect actual results. The record contains no evidence as to how the projections were calculated.
There is evidence that Paul Kramer, Parlour's Chief Operating Officer and Secretary, prepared the projections with the help of Court Huish. Kramer had been involved in the restaurant business since graduating from high school in 1983. From 1983 to 2000 when Parlour was formed, he actively oversaw the operation of numerous restaurants and was involved in restaurant franchising, which gave him an intimate knowledge of that business, including raising capital, hiring staff, and providing proper training. Huish, an officer of Parlour, was also experienced in the restaurant business. He had a bachelor's degree in finance from Brigham Young University, and a master's degree in business administration from San Francisco State University. For 18 years, he worked for the Huish Family Fun Centers, first as Director of Operations, then as Chief Operating Officer. During his tenure, the company purchased three franchises for Bullwinkle's restaurants, then purchased the rights to the Bullwinkle's concept and sold Bullwinkle's franchises to others. Later, Huish invested in and helped raise nearly $2 million in funds for three fun centers in Boise, Idaho, Salt Lake City, Utah, and Denver, Colorado.
Despite the extensive experience of both men in the restaurant industry, neither testified to any particular qualifications that would allow them to predict income, expenses or profits for a Farrell's, as opposed to any other restaurant. Nor did anyone testify as to the facts underlying the projections or the calculations used to prepare them. There was no testimony they based their predictions on the operation of the single Farrell's that Parlour was able to open in Santa Clarita or on any other actual numbers that would be a reliable indicator of future income, expenses, or profits of a Farrell's located in another city.
Kramer did testify that he consulted with Chan in preparing the projections. Chan admitted that he had discussed the projections with Kramer and Michael Fleming, a Parlour shareholder and that "we ... backed into our numbers, ... [meaning] we knew what we had to do in order for this to be economically viable." Chan further admitted that "[biased on the fact that [the projections are] estimates, or proformas, you can't really say they're inaccurate. They could be optimistic, but they're not necessarily inaccurate." But none of this shows how the projections were actually calculated or upon what facts they were based.
Although prelitigation projections are relevant and admissible, especially when they are prepared by the defendant (Kids' Universe, supra, 95 Cal.App.4th at p. 886, 116 Cal.Rptr.2d 158; S. Jon Kreedman & Co. v. Meyers Bros. Parking-Western Corp., supra, 58 Cal.App.3d at p. 185, 130 Cal.Rptr. 41), the projections must nevertheless be based on facts that are substantially similar to the lost business opportunity. (Kids' Universe, supra, 95 Cal. App.4th at p. 886, 116 Cal.Rptr.2d 158.) There is no evidence that was done here.

(b) Market Data for Friendly's and Ice Cream Parlors

Wunderlich used the projections only as a starting point for his calculations. He also considered market data about "a couple of dozen ice cream parlors," plus a publicly-traded restaurant chain called *195 Friendly's, which he claimed was "relatively similar to the Farrell's concept." The only evidence of similarity, however, is Wunderlich's testimony that it "is a chain of about 300 or so restaurants, which is similar to Farrell's in that it has both the ice cream end and the food end." But many restaurants serve both ice cream and food; that alone does not make them sufficiently similar to Farrell's for purposes of proving lost prospective profits. (Kids' Universe, supra, 95 Cal.App.4th at p. 884, 116 Cal.Rptr.2d 158.) Although one way to prove prospective profits is through the experience of similar businesses, Wunderlich's cursory description of Friendly's business model failed to establish its profit and loss experience is sufficiently similar to Farrell's to be relevant to the question of plaintiffs' alleged lost profits.
Nor have they made this showing with respect to the. dozen or so ice cream parlors whose market data Wunderlich considered. Wunderlich admitted these ice cream parlors were smaller operations that served only ice cream and concluded these stores were not similar enough to the Farrell's concept, as he relied more on the data from Friendly's because it served both food and ice cream.

(c) Data From Existing Farrell's and Other Businesses

Wunderlich testified that he further considered financial information relating to the San Diego and Santa Clarita Farrell's, as well as industry data for a variety of businesses. But Wunderlich also admitted he did not use the actual numbers from the Santa Clarita location as a starting point for his lost profit estimates for the other locations. As to his consideration of the data from the San Diego location, all he did was speak to Parlour's principals about that restaurant's revenues, expenses, and profits. There is no evidence in the record regarding what those numbers were or how they impacted his calculations. The same problem exists with respect to the industry data for the different businesses. Before evidence of similar businesses may be used to prove loss of prospective profits, the underlying requirement is that there be "`a substantial similarity between the facts forming the basis of the profit projections and the business opportunity that was destroyed.' [Citation.]" (Kids' Universe, supra, 95 Cal. App.4th at p. 886, 116 Cal.Rptr.2d 158.) This requirement was not met.

(2) Lost Franchise Fees

Wunderlich calculated lost franchise fees for all eight locations. His calculations included a percentage of the total gross revenue estimated for all eight locations and a $35,000 one-time fee for each of the seven proposed restaurants.
Because the gross value calculation relied on the same unreliable data Wunderlich used to determine lost profits, franchise fees based on a percentage of the gross revenue are not recoverable in this case. Nor can Parlour recover from defendants the $35,000 up-front fee for any of the seven proposed restaurants.
For the Block at Orange, Parlour had entered into a subfranchise agreement with Fun Foods Block. The agreement declares, in relevant part, "Initial Franchise Fee. You'll pay us, on signing this Agreement, an initial franchise fee.... The initial franchise fee is fully earned by us on signing of this Agreement and is entirely nonrefundable...." (Bold and underscoring omitted.) Upon signing the agreement, therefore, Fun Foods Block immediately owed Parlour the initial fee. If Parlour never received that fee, its remedy is against Fun Foods Block, not defendants.
*196 As to Aliso Viejo, both parties initially asserted in their briefs that Fun Foods 1 had entered into a subfranchise agreement with Parlour. The cited portions of the record, however, do not substantiate that assertion. Then, in their supplemental letter brief, defendants claim "[t]here was never a signed [subfranchise] agreement ... for Aliso Viejo." That statement is also not supported by defendants' record citations. Either way, Parlour was not entitled to recover the $35,000 initial fee from defendants. If the parties had entered into a subfranchise agreement before the ADA was terminated, the initial fee would have been owed by Fun Foods 1. If no subfranchise agreement was entered before then, Parlour had to show such an agreement was likely. But the record contains no evidence Parlour was negotiating with the buyer of the property or at another nearby location. Absent such evidence, Parlour's ability to enter into a subfranchise agreement and recover the initial fee was entirely speculative.
Regarding Fresno, Parlour presented evidence it had an investor who was "moving forward" and that he had "the franchise documents and is preparing the lease for the location...." But there was also evidence that Chan would not approve the Fresno site because he "believe[d] that ... moving forward with Fresno [was] premature...." Without Chan's approval, no subfranchise agreement could be entered into at that time.
Subfranchise agreements were also speculative with respect to the remaining four locations. Although Parlour and Powerhouse had informally agreed to build restaurants in four cities, specific locations had not yet been chosen. Moreover, defendants presented evidence they would never have approved of the Powerhouse proposal to build the four restaurants because Powerhouse wanted a "package" deal. This included a requirement that Chan sign an estoppel agreement, which Chan would not do. Powerhouse stated that defendants' refusal to sign the estoppel agreement was a "real problem for [it]." Perhaps the parties could have come to an agreement if allowed more time to negotiate, but at the time the ADA was terminated, it was speculative whether Parlour would have been able secure signed franchise agreements for the four locations.

(3) Extra Expenses

When one party to a contract is prevented from performing by the other party, "`the primary measure of damages is the amount of his loss, which may consist of his reasonable outlay or expenditure toward performance....'" (Buxbom v. Smith (1944) 23 Cal.2d 535, 541, 145 P.2d 305; Gollaher v. Midwood Constr. Co. (1961) 194 Cal.App.2d 640, 649, 15 Cal. Rptr. 292.) Here, Wunderlich's calculations included $202,929 in extra expenses incurred by plaintiffs. To arrive at this number, Wunderlich examined plaintiffs' bank records and added up the expenditures made by plaintiffs toward developing the different locations. The $202,929 in extra expenses is based on concrete evidence and is reasonably certain. Wunderlich's calculation of extra expenses is thus supported by substantial evidence. Defendants do not challenge these expenses.
It is unclear whether the jury's award of approximately $6.6 million incorporated the $202,929 in extra expenses calculated by Wunderlich. The closeness of the award to Wunderlich's calculation of plaintiffs' total damages approximately $6.7 million suggests that they did and we resolve this inference in plaintiffs' favor. The judgment is affirmed to the extent it includes an award of $202,929 for the expenditures *197 made by plaintiffs toward developing the different locations.

DISPOSITION
The matter is remanded to the trial court with directions to reduce the award of damages to $202,929. As so modified, the judgment is affirmed. The parties shall bear their own costs on appeal.
WE CONCUR: SILLS, P.J., and FYBEL, J.