Filed 1/8/21  WindAirWest v. Castle & Cooke etc. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| WINDAIRWEST, LLC,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CASTLE & COOKE AVIATION SERVICES, INC.,<br><br>Defendant and Appellant. | B295513, consolidated with B299043<br><br>Los Angeles County Super. Ct. No. LC104747 |

APPEAL from a judgment and order of the Superior Court of Los Angeles County, Elaine W. Mandel and Shirley K. Watkins, Judges.  Affirmed in part, reversed in part.

Wilson Elser Moskowitz Edelman & Dicker, John P. Loringer, Kevin F. Geary, and William J. Katt for Defendant and Appellant.

Miller Barondess and Amnon Z. Siegel; Myers Andras Ashman Kumamoto, Phillip Ashman, and Brian A. Kumamoto for Plaintiff and Respondent.

_____

Defendant Castle & Cooke Aviation Services, Inc. (C&C) appeals from a judgment awarding plaintiff WindAirWest, LLC (WAW) lost profits from the disruption of WAW's private jet charter operation after C&C negligently caused a collision that damaged one of WAW's aircraft. C&C contends WAW's damages expert based his lost profits calculation on speculation and the trial court erred when it denied C&C's motion for directed verdict. We conclude there was a substantial evidentiary basis for the expert's opinion and the trial court properly allowed the case to go to the jury.

C&C also challenges the trial court's ruling rejecting C&C's objection to the judgment based on a purported pre-trial settlement agreement. And C&C appeals the court's order awarding WAW attorney fees under a fee provision of the parties' sublease. We conclude the trial court properly rejected C&C's objection to the judgment, but the court erred when it awarded attorney fees for a tort claim that the fee provision does not cover. Accordingly, we will affirm the judgment and reverse the order awarding attorney fees.

## FACTS AND PROCEDURAL BACKGROUND

Consistent with the standard of review for an appeal from the denial of a directed verdict, we state the evidence in the light most favorable to the respondent, WAW, accepting the evidence favorable to WAW as true, disregarding conflicts, and resolving all presumptions, inferences, and doubts in favor of WAW. (*Colbaugh v. Hartline* (1994) 29 Cal.App.4th 1516, 1521 (*Colbaugh*).) We discuss the facts and procedural history relevant to C&C's objection to the judgment and WAW's motion for attorney fees in separate sections below.

1.    *The Parties*

WAW is a private air charter company.  It has a license from the Federal Aviation Administration (FAA), referred to as a Part 135 Certificate (135 Certificate), that allows it to hold out aircraft for hire.

C&C is a fixed-base operator.  The company leases space at the Van Nuys Airport from the local municipality and provides aircraft services to aviation companies that sublease parts of the space from C&C.

2.    ***WAW Begins Charter Operations with the Astra Aircraft***

In 2012, Clifton Simonson became the managing member of WAW.  The same year, WAW acquired a Gulfstream G100, commonly referred to as the Astra, and hired two pilots.  About a year later, WAW added the Astra to its 135 Certificate, which allowed WAW to offer the Astra for charter flights.  From 2013 to 2015, approximately 50 percent of WAW's flights with the Astra were for private charter.

In 2015, WAW hired Lewis Bell as its Director of Sales and Marketing to focus on its charter business.  Before joining WAW, Bell had about 20 years of experience in the charter industry. His positions ranged from manager of a charter department, to air charter broker, to owner of a private jet company.  As an air charter broker, Bell sourced aircrafts for hire on behalf of an extensive book of clients.

In his first year with WAW, Bell doubled the company's charter revenue from approximately $300,000 in 2014 to about $600,000 in 2015.  He doubled charter revenue again in 2016 to approximately $1.2 million.  In that year WAW was profitable with the Astra.

Bell was able to increase WAW's charter business by drawing on contacts he generated as a charter broker and by offering one-way pricing. As Bell explained, most charter companies offer only roundtrip pricing. Under that model, a customer pays for the charter aircraft to make a roundtrip flight, even if the customer only rides on one leg of the trip. The one-way model offers customers the option to pay for only a one-way trip, while the charter company takes it upon itself to bring the aircraft home. Although the charter company charges more per hour for one-way pricing, the option is still cheaper for the customer than roundtrip pricing, and thus translates into a competitive advantage for those companies that can successfully execute the one-way model.

Before he joined WAW, Bell had operated a one-way pricing model at his own charter company and at another charter company he managed. At the other company, Bell operated the one-way model profitably for three years until the company was sold.

3. **WAW Adds a Citation X Aircraft to Its Charter Operation**

In April 2016, WAW entered into a dry lease agreement with Jayhawk to rent a Citation X aircraft from the company for $35,000 per month.[1] The Citation X is the world's fastest private jet and is popular in the charter industry. After considering approximately 30 different aircraft, Bell recommended WAW acquire Jayhawk's Citation X because it was in "immaculate" condition, the interior was completely refurbished, and the

---

[1] A dry lease is an aircraft leasing arrangement under which the lessor provides an aircraft without a crew or ground staff.

4

aircraft had winglets—a modification that allows an aircraft to burn less fuel to reach its cruising altitude.

Before WAW leased the Citation X, Bell created projections for Simonson's review. Bell projected WAW would initially charter the Citation X for approximately 20 revenue hours per month and, over an 18-month period, would "ramp up" to approximately 60 revenue hours per month.[2]

Bell's projections were based on a business plan that contemplated chartering multiple Citation X aircraft out of the Van Nuys airport. Van Nuys is the second largest airport for private charter flights and, at the time, there was not a Citation X based there. WAW also committed to charter the Citation X without owner restrictions and to market it as such. This was significant because private charter aircraft owners typically must pre-approve charter flights, which can lead to delays and lost business for the charter operator. WAW would also offer one-way pricing where appropriate, but it would continue to offer roundtrip pricing too.

WAW had its two existing Astra pilots trained so they could be qualified to fly, or "type-rated" for, the Citation X. Additionally, WAW hired two new pilots and paid for their Citation X training.

The dry lease with Jayhawk was a lease to purchase, which allowed WAW to offer the Citation X for charter for 13 months and then purchase the aircraft at the end of the lease

---

[2] A "revenue hour" is an hour that the customer pays for the aircraft to fly. A "flight hour" includes revenue hours and non-revenue or "dead leg" hours—i.e., all hours flown.

for $3.8 million. If WAW decided not to purchase the Citation X, the lease obligated it to pay a "breakup fee" of $250,000.

**4.    *C&C Causes a Collision that Prevents WAW from Chartering the Citation X for Six Months***

On June 1, 2016, WAW entered into a sublease with C&C. The sublease gave WAW access to C&C's facilities at Van Nuys airport, including ramp and hangar space as well as an office.

On June 10, 2016, WAW flew the Citation X to Van Nuys airport for the final FAA conformity inspection in anticipation of receiving approval to add the aircraft to its 135 Certificate. With FAA approval imminent, WAW was prepared to offer charter flights beginning in July 2016. Bell sent marketing materials to approximately 200 of the largest charter brokers and received many inquiries in return.

On June 21, 2016, a C&C employee moved the Citation X to access a different aircraft. The C&C employee parked the Citation X on a downhill slope, and failed to properly place wheel chocks to prevent accidental movement. As a result, the Citation X was seriously damaged when it rolled down the slope into another aircraft.

Due to the damage to the Citation X, WAW was forced to send the aircraft to the Cessna Aircraft Company's headquarters in Wichita, Kansas to be repaired. The repairs took approximately six months.

**5.    *WAW Charters the Citation X in 2017***

WAW received the Citation X back from the Cessna repair facility in late December 2016. Earlier that month, the FAA determined the aircraft would be airworthy and added it to the 135 Certificate.

WAW began offering the Citation X for charter flights in January 2017. However, during the repair period, one of its Citation X pilots quit, leaving WAW with only one captain and two co-captains to fly the aircraft. This impaired WAW's ability to charter flights because its only captain had to be on every flight, and the FAA requires a pilot to take two weeks off after flying for two weeks.

The Citation X also experienced two significant mechanical issues in early 2017 involving the nose of the aircraft, which had been damaged in the accident. In January 2017, when WAW was flying a high-profile client, the nose wheel did not retract after taking off, forcing WAW to arrange alternative transportation for the client's return trip. WAW had to return the Citation X to the Cessna facility for further repairs. A second mechanical failure occurred two weeks later. The nose wheel steering failed on the tarmac with passengers on board, forcing WAW to refund the customers' money and arrange for alternate transportation.

WAW operated the Citation X for the first five months of 2017, but did not generate a profit. Ultimately it decided not to purchase the aircraft in May 2017.

**6.** ***The Lawsuit and Trial***

On October 11, 2016, WAW filed a complaint against C&C, asserting two causes of action for negligence and breach of the sublease. On May 1, 2018, WAW filed a first amended complaint, which dropped the breach of contract claim and asserted only a single claim of negligence.

Shortly before trial, C&C conceded liability, admitting its conduct constituted gross negligence. Thus, the only issue to be

determined at trial was whether C&C's conduct caused WAW to lose profits and, if so, how much.

At trial, WAW presented testimony from Simonson, Bell, other fact witnesses, its industry expert, Christopher Battaglia, and its damages expert, Owen Dahl. As we discuss later, Dahl, a business valuation expert, based his lost profits calculations on evidence offered through Simonson's, Bell's, and Battaglia's testimony, as well as WAW's company records and market data from aviation industry consultants. In total, Dahl projected $4,235,935 in lost profits for WAW as a result of C&C's negligence.

At the close of testimony, C&C moved for a directed verdict on the ground that Dahl's testimony was based entirely on "speculation." C&C argued WAW's expansion of its charter operation into a one-way model with the Citation X constituted an " 'unestablished business' " for which lost profits were " 'not recoverable for the reason that their occurrence is uncertain, contingent and speculative.' "

The trial court denied C&C's motion for directed verdict, concluding WAW presented sufficient evidence of actual charter operations to support Dahl's damages opinion.

The case went to the jury, which returned a verdict in favor of WAW, awarding it $2,464,560 in lost profits.

**DISCUSSION**

1. ***Reasonably Reliable Evidence Supported WAW's Recovery of Lost Profits***

C&C contends WAW's one-way charter operation was an unestablished business, rendering any theory for the recovery of lost profits "inherently speculative" and legally insufficient to support a damages award. Thus, C&C argues the trial court

8

erred when it denied C&C's motion for a directed verdict. We conclude the trial court's ruling was correct.

"A directed verdict is . . . subjected to de novo appellate review. . . . 'A motion for a directed verdict "is in the nature of a demurrer to the evidence, and is governed by practically the same rules, and concedes as true the evidence on behalf of the adverse party, with all fair and reasonable inferences to be deduced therefrom." ' " (*Brassinga v. City of Mountain View* (1998) 66 Cal.App.4th 195, 210, fn. omitted.) " 'A defendant is entitled to a [directed verdict] if the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to permit a jury to find in his favor. [Citation.] "In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded. . . ." ' " (*Colbaugh, supra*, 29 Cal.App.4th at p. 1521.) We will not find the trial court erred in denying a directed verdict " ' " 'unless interpreting the evidence most favorably to plaintiff's case and most strongly against the defendant and resolving all presumptions, inferences and doubts in favor of the plaintiff a judgment for the defendant is required as a matter of law.' " ' " (*Ibid.*; *Baker v. American Horticulture Supply, Inc.* (2010) 186 Cal.App.4th 1059, 1072.)

"[D]amages for the loss of prospective profits are recoverable where the evidence makes reasonably certain their occurrence and extent." (*Grupe v. Glick* (1945) 26 Cal.2d 680, 693 (*Grupe*); *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773–774 (*Sargon*).) Such damages must be proven to be certain, "albeit not with

9

'mathematical precision.' " (*Lewis Jorge Construction Management, Inc. v. Pomona Unified School Dist.* (2004) 34 Cal.4th 960, 975; *Sargon*, at p. 774.)

"Regarding lost business profits, the cases have generally distinguished between established and unestablished businesses." (*Sargon, supra,* 55 Cal.4th at p. 774.) Where an established business's operation is prevented or interrupted, " 'damages for the loss of prospective profits that otherwise might have been made from its operation are generally recoverable for the reason that their occurrence and extent may be ascertained with reasonable certainty from the past volume of business and other provable data relevant to the probable future sales.' " (*Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 883 (*Kids' Universe*), citing *Grupe, supra,* 26 Cal.2d at pp. 692–693; see also *Sargon,* at p. 774; *Parlour Enterprises, Inc. v. Kirin Group, Inc.* (2007) 152 Cal.App.4th 281, 287–288 (*Parlour*).) "On the other hand, lost anticipated profits for an unestablished business whose operation is prevented or interrupted are generally not recoverable because their occurrence is uncertain, contingent and speculative." (*Parlour,* at p. 288; *Sargon,* at p. 774.) Nevertheless, lost profits for an unestablished business "are allowed where their nature and occurrence can be shown by evidence of reasonable reliability." (*Grupe,* at pp. 692–693; *Kids' Universe,* at p. 883 [lost profits for an unestablished business may be recovered " 'where the evidence makes reasonably certain their occurrence and extent' "]; *Sargon,* at p. 774 [same].)

"The award of damages for loss of profits depends upon whether there is a satisfactory basis for estimating what the probable earnings would have been had there been no tort.

If no such basis exists, as in cases where the establishment of a business is prevented, it may be necessary to deny such recovery. [Citations.] If, however, there has been operating experience sufficient to permit a reasonable estimate of probable income and expense, damages for loss of prospective profits are awarded." (*Natural Soda Products Co. v. Los Angeles* (1943) 23 Cal.2d 193, 199 (*Natural Soda*); *Kids' Universe, supra,* 95 Cal.App.4th at p. 883.) "It is enough to demonstrate a reasonable probability that profits would have been earned except for the defendant's conduct." (*S.C. Anderson, Inc. v. Bank of America* (1994) 24 Cal.App.4th 529, 536 (*S.C. Anderson*).)

" 'Where the *fact* of damages is certain, the amount of damages need not be calculated with absolute certainty. [Citations.] The law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation. [Citation.] This is especially true where . . . it is the wrongful acts of the defendant that have created the difficulty in proving the amount of loss of profits [citation] or where it is the wrongful acts of the defendant that have caused the other party to not realize a profit to which that party is entitled.' " (*Sargon, supra,* 55 Cal.4th at pp. 774–775; *Natural Soda, supra,* 23 Cal.2d at p. 200 ["Since defendant made it impossible for plaintiff to realize any profits, it cannot complain if the probable profits are of necessity estimated."].)

The parties disagree about whether the evidence proved WAW was an established or unestablished business. The distinction makes no difference in this case. Even if we assume WAW's one-way charter model constituted an unestablished business (as C&C contends), we still find there was sufficient

11

evidence "to demonstrate a reasonable probability that profits would have been earned" but for C&C's conduct.  (*S.C. Anderson, supra,* 24 Cal.App.4th at p. 536; *Kids' Universe, supra,* 95 Cal.App.4th at pp. 883–884.)

As the reviewing court explained in *Kids' Universe*, "[w]hen the operation of an *unestablished business* is prevented, as here, prospective profits may be shown in various ways."  (*Kids' Universe, supra,* 95 Cal.App.4th at p. 884, italics added.) " '[I]f the business is a new one or if it is a speculative one . . . , damages may be established with reasonable certainty with the aid of expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and the like.' "  (*Ibid.*)  " 'When the tortfeasor has prevented the beginning of a new business . . . all factors relevant to the likelihood of the success or lack of success of the business or transaction that are reasonably provable are to be considered, including general business conditions and the degree of success of similar enterprises.' "  (*Ibid.*)  Consistent with these principles, our Courts of Appeal have held "the experience of similar businesses is one way to prove prospective profits."  (*Id.* at p. 885, citing *Resort Video, Ltd. v. Laser Video, Inc.* (1995) 35 Cal.App.4th 1679, 1699; *Berge v. International Harvester Co.* (1983) 142 Cal.App.3d 152, 163 (*Berge*) [a plaintiff can rely on "data from other enterprises" operating under "similar conditions"].)

Another relevant consideration is "whether the market is an established one," even if the particular business operation is new.  (*Kids' Universe, supra,* 95 Cal.App.4th at p. 885.)  *S. Jon Kreedman & Co. v. Meyers Bros. Parking-Western Corp.* (1976) 58 Cal.App.3d 173 (*Kreedman*) is instructive.  There, the reviewing

court affirmed an award of lost profits for a parking garage operator (Meyers) against a real estate developer, even though the contemplated parking structure was never built. (*Id.* at pp. 178, 184–185.) The parties agreed the structure would consist of nine levels above ground and two levels below, with subterranean levels adjoining another garage in the One Wilshire Building, and commercial establishments on the first floor and part of the second floor. (*Id.* at p. 182.) The evidence showed that although the particular parking structure would have been new, the parking business was not, and Meyers " 'was a highly experienced garage operator.' " (*Id.* at pp. 182, 185.) A land economist also opined "based on feasibility studies and the evidence developed at the trial that the parking garage, had it been constructed, would have been a very profitable operation." (*Id.* at p. 185.) And, a longtime employee of Meyers testified concerning the profitability of a subterranean garage in the One Wilshire Building that Meyers already operated. (*Ibid.*) The *Kreedman* court held this evidence was sufficient to support Meyers's lost profits claim, notwithstanding the lack of past business volume for the contemplated garage and competing evidence, offered by the developer's expert, showing garages he operated in the area had recently gone bankrupt. (*Ibid.*)

Here, the evidence demonstrated WAW had a reasonable probability of earning profits from its one-way charter business with the Citation X, and there was a nonspeculative basis to calculate those profits with reasonable certainty. (See *Kreedman, supra,* 58 Cal.App.3d at pp. 184–185; *S.C. Anderson, supra,* 24 Cal.App.4th at p. 536; *Kids' Universe, supra,* 95 Cal.App.4th at pp. 883–884.)

13

The testimony of WAW's Director of Sales and Marketing, Lewis Bell, and WAW's industry expert, Christopher Battaglia, demonstrated the market for chartered private jets, like the parking business in *Kreedman,* was an established one. Together with WAW's owner, Clifton Simonson, they showed WAW had a significant four-year track record operating in the charter market, including profitable operations with the company's Astra aircraft, and the company had made substantial preparations to expand its operations with the Citation X, including training two pilots and hiring and training two more to fly the new aircraft. Bell's and Battaglia's testimony also established charter companies had been offering one-way pricing for at least 10 years, and both experts testified to their own successful execution of the model at prior companies. And, critically, Bell's testimony showed WAW had successfully offered one-way pricing with the Astra, which allowed Bell to double charter revenue each year for his first two years with WAW.

Regarding the projected monthly flight hours for the Citation X, Bell and Battaglia each testified, based on their experience in the charter market, the appeal of WAW's Citation X, the company's team of four pilots, and WAW's exclusive commitment of the aircraft to charter operations, that it was reasonably probable the Citation X's total flight hours would ramp up from 20 hours in the first month to 80 hours a month over an 18-month period.[3] Battaglia opined WAW

---

[3] Like Bell and Battaglia, C&C's experts acknowledged the Citation X is a highly desirable aircraft for charter, it is well known in the industry, and "easy to sell." They also acknowledged WAW could reasonably expect to achieve more

"could have easily done 80 hours a month," citing his experience running a one-way model at a similar charter operator where, with three aircraft, the operator was able to bill "upwards of 90 to a hundred hours . . . a month per aircraft."[4]  He also cited WAW's actual performance history, which showed it had chartered the Astra—an "inferior aircraft"—between 50 and 70 hours per month with just two pilots.  All experts, including C&C's, agreed WAW could reasonably expect to achieve more hours with additional pilots.  The 80-hour figure was grounded in " 'reasonably provable' " factors relevant to WAW's likelihood of achieving success with the one-way model for its new Citation X.  (*Kids' Universe, supra,* 95 Cal.App.4th at pp. 884–885 ["the experience of similar businesses is one way to prove prospective profits" for an unestablished business]; *Berge, supra,* 142 Cal.App.3d at p. 163 [same].)

To calculate revenues, WAW's damages expert, Owen Dahl, used actual data from the 2017 period when WAW chartered the Citation X to determine the "dead leg" percentage—i.e., the

flight hours with additional pilots and by exclusively committing the aircraft to charter operations.

[4]     C&C complains that Battaglia based his opinion on a conversation with an unidentified individual at XoJet—a charter company that utilized a one-way model with 25 aircraft available for charter.  The contention ignores that in delivering his opinion, Battaglia drew directly upon his own experience with a more modest charter operation similar to WAW.  C&C's failure to address this testimony disregards our standard of review, which requires that we accept the evidence most favorable to WAW and resolve all presumptions, inferences, and doubts in its favor. (*Colbaugh, supra,* 29 Cal.App.4th at p. 1521.)

percentage of flight time dedicated to nonrevenue operations—
and to test whether his model was consistent with the actual
revenue hours WAW had achieved. From that data, Dahl derived
a dead leg percentage of 14.9 percent, which reduced the 80-hour
total flight time figure to 68.1 revenue hours per month.[5] The
evidence showed that figure was consistent with WAW's actual
charter performance with the Astra.[6] Then, using a combination
of WAW's actual data from its Citation X operation in 2017
and data from the charter industry generally, Dahl derived
a projected hourly rate for the Citation X. He multiplied
the projected revenue hours by that rate to determine the
Citation X's projected operating revenues for the relevant period

---

[5]    Notably, C&C's industry experts conceded that, with four
pilots, WAW would have been able to achieve up to 60 revenue
hours per month—just eight fewer hours than Dahl calculated.
Like Bell, Battaglia, and Dahl, C&C's experts based their
opinions on their experience in the established charter market
and on WAW's historical performance data. While the conflict
between Dahl's 68-revenue-hour projection and C&C's 60-hour
figure presented a factual dispute for the jury to resolve, the
opposing experts' reliance on essentially the same matters
belies C&C's assertion that WAW's lost profit calculation
was speculatively based.

[6]    The evidence showed WAW flew the Astra for 65.7 revenue
hours in January 2016; 61.3 revenue hours in September 2016;
and 68.4 revenue hours in November 2016. Unlike the Citation
X, the Astra's charter operations were not interrupted by C&C's
admitted misconduct. Thus, the Astra data offered a view into
what the Citation X's operations could have been when fully
ramped up. (*Berge, supra,* 142 Cal.App.3d at p. 163 [a plaintiff
can rely on "data from other enterprises" operating under
"similar conditions"].)

of loss.  This approach was plainly consistent with accepted methods for calculating business revenues as a component of lost net profits.  (See *Kids' Universe, supra,* 95 Cal.App.4th at p. 884 [" '[I]f the business is a new one . . . , damages may be established with reasonable certainty with the aid of expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and the like.' "].)

Finally, to calculate WAW's recoverable damages, Dahl needed to determine its projected expenses.  (*Kids' Universe, supra,* 95 Cal.App.4th at p. 884 ["A plaintiff must show loss of net pecuniary gain, not just loss of gross revenue."].)  He started by identifying individual expense items, then used WAW's historical financial statements and expense data specific to the Citation X from a recognized aviation consultant, Conklin & de Decker, to create a forecast of operating expenses for the aircraft.[7]  Dahl also used WAW's flight logs from the Citation X's 2017 operations to calculate the aircraft's fuel burn rate.  Like the evidence underlying his revenue calculation, this evidence afforded Dahl a nonspeculative basis to determine WAW's probable expenses for the Citation X during the relevant period of loss.  (See *Kreedman, supra,* 58 Cal.App.3d at pp. 184–185; *S.C. Anderson, supra,* 24 Cal.App.4th at p. 536; *Kids' Universe, supra,* 95 Cal.App.4th at pp. 883–884.)

C&C's reliance on *Kids' Universe* is misplaced.  The plaintiff in that case, a toy retailer, operated a brick-and-mortar toy store and had made preparations to launch an online retail operation for its products.  (*Kids' Universe, supra,* 95 Cal.App.4th

---

[7]     C&C's expert agreed Conklin & de Decker was a reliable source for expense data.

at pp. 874–875.)  The defendants negligently caused a flood that severely damaged the store, forcing its two-week closure and preventing the company from launching its online store. (*Id.* at p. 874.)  The company sued, claiming lost profits stemming from its inability to launch its Web site at an "optimal time" for e-business.  (*Id.* at p. 877.)  It offered evidence showing it had a "state-of-the-art Web site," "favorable" placement on "fast-growing" and " 'high[ly] trafficked' " Web portals, and it was "prepared to meet customers' on-line orders."  (*Id.* at pp. 886–887.)  The company asserted it would attract "significant venture capital" and, given the planned timing of the venture, it "would have been in a position to be a financially successful leader in the e-commerce sale of toys."  (*Id.* at p. 887.)  Its expert "assum[ed]" it would be a "roughly equal competitor[ ]" with another online toy retailer, and opined the company's capital value would be "in excess of $50 million."  (*Ibid.*)

The *Kids' Universe* court concluded the plaintiff's "evidence, while *suggesting* the Web site would have been viable, [was] not of a type necessary to demonstrate . . . *to a reasonable certainty* that the unestablished business would have made a *profit.*" (*Kids' Universe, supra,* 95 Cal.App.4th at p. 887.)  The company had "not previously operated [its] Web site as a *profit*-producing venture," and, critically, "the on-line market for toys was not an established one."  (*Ibid.*)  The plaintiff "presented no specific economic or financial data, market survey, or analysis based on the business records or operating histories of similar enterprises," and its expert's conclusion that the on-line business would be profitable "was based on an unanalyzed *assumption* the [plaintiff's] Web site would have been a roughly equal competitor with eToys."  (*Id.* at p. 888.)  The lack of evidence to substantiate

18

the assumption rendered the comparison with eToys insufficient to prove the plaintiff would have "realized net *profits* from the operation of its on-line business." (*Ibid.*)

Unlike the toy retailer's proposed online business in *Kids' Universe*, WAW had a four-year track record operating within an established market with reliable market surveys and analyses. Its Director of Sales and Marketing and industry expert had experience with charter operations generally and with the one-way model specifically. And, unlike the plaintiff in *Kids' Universe*, WAW had a history of profitably chartering the Astra, as well as actual data from its four-month operation of the Citation X. Dahl had a reasonable basis for his opinion and the evidence was sufficient to demonstrate a reasonable probability that profits would have been earned but for C&C's conduct. (*S.C. Anderson, supra,* 24 Cal.App.4th at p. 536; *Kids' Universe, supra,* 95 Cal.App.4th at pp. 884–885; *Kreedman, supra,* 58 Cal.App.3d at pp. 184–185.)

In sum, even if we accept that WAW's use of a one-way charter model for its new Citation X was an unestablished business, as C&C contends, the record shows Dahl relied upon data and evidence that afforded a nonspeculative basis to calculate those profits with reasonable certainty. The trial court did not err when it denied the motion for directed verdict.

2. ***The $300,000 Offset Was Not Enforceable as Part of a Settlement Agreement Under Code of Civil Procedure Section 664.6***

C&C filed an objection to WAW's request for entry of judgment, arguing it was entitled to a $300,000 credit under a purported mediation agreement. The trial court rejected C&C's objection and entered judgment in the full amount of the jury's

19

verdict.[8]  Because the writing prepared at the mediation was not enforceable under the relevant version of section 664.6, we conclude the court properly rejected the objection.

On December 9, 2016, the parties participated in a mediation.  They prepared a writing at the mediation's conclusion, stating in relevant part:  "The Parties have not resolved the litigation, however, they reached the following agreement: [¶] 1. [C&C], through its insurance carrier USAIG, will make a payment of three hundred thousand dollars ($300,000.00) to [WAW] as soon as possible . . . to be used to pay outstanding amounts due to [the owner of the Citation X]. . . . ; [¶] . . . 4. [C&C], through its insurance carrier USAIG, shall receive a credit for the $300,000.00 payment made herein pursuant to this agreement against all other claims or damages that may be awarded to [WAW]."  The document was executed by

_____

[8]     Statutory references are to the Code of Civil Procedure, unless otherwise designated.  The trial court concluded the writing at issue was inadmissible under the mediation privilege.  (See Evid. Code, § 1119.)  We do not reach the question of admissibility because we conclude the writing was not enforceable under the version of section 664.6 that existed when the document was signed and enforcement was sought.  Because the issue is one of statutory interpretation, we review the ruling de novo, exercising our independent judgment, and must affirm on any ground supported by the record, even if the trial court did not expressly consider it.  (See *Los Angeles County Prof. Peace Officers' Assn. v. County of Los Angeles* (2004) 115 Cal.App.4th 866, 869 [questions of law such as statutory interpretation are subject to the appellate court's independent judgment]; *Jimenez v. County of Los Angeles* (2005) 130 Cal.App.4th 133, 140 [where the trial court's ruling implicates a legal question, an appellate court must affirm on any ground supported by the record].)

Clif Simonson, as Member for WAW. However, with respect to C&C and USAIG, the document was executed "by and through their attorney, Peter Brotzen."

On November 16, 2018, C&C filed its objection to WAW's request for entry of judgment. C&C argued the provision for a $300,000 credit was enforceable as a part of a settlement agreement under section 664.6.[9]

At the time relevant here, section 664.6 provided: "If parties to pending litigation stipulate, in a writing signed by the parties outside the presence of the court or orally before the court, for settlement of the case, or part thereof, the court, upon motion, may enter judgment pursuant to the terms of the settlement. If requested by the parties, the court may retain jurisdiction over the parties to enforce the settlement until performance in full of the terms of the settlement."[10]

---

[9] C&C did not present evidence, either at trial or in its objection to the judgment, proving its insurance carrier paid WAW $300,000 as stipulated in the mediation writing. WAW does not dispute that it received a $300,000 payment; however, it argues the payment was made for repairs to the Citation X— not to pay amounts due to the aircraft's owner—and Dahl had already accounted for those covered repair costs in his damages calculation.

[10] On September 29, 2020, the Governor approved A.B. 2723, which amends section 664.6 to add the following subparagraphs: "(b) For purposes of this section, a writing is signed by a party if it is signed by any of the following: [¶] (1) The party. [¶] (2) An attorney who represents the party. [¶] (3) If the party is an insurer, an agent who is authorized in writing by the insurer to sign on the insurer's behalf.
"(c) Paragraphs (2) and (3) of subdivision (b) do not apply in a civil harassment action, an action brought pursuant

21

In *Levy v. Superior Court* (1995) 10 Cal.4th 578 (*Levy*), our Supreme Court addressed "whether the written stipulation must be signed personally by the litigant, or whether the signature of the litigant's attorney is sufficient to create a settlement enforceable under section 664.6." (*Id.* at p. 580.) Because the settlement of a lawsuit implicates a substantial right of the litigants themselves, our high court concluded that "in providing for an enforcement mechanism for settlements by 'parties,' the Legislature intended the term to literally mean the litigants personally." (*Id.* at p. 584.) Because the litigants' attorneys, and not the litigants themselves, had executed the purported settlement agreement, the *Levy* court held the agreement was not enforceable under section 664.6. (*Levy*, at p. 586.)

Since *Levy*, the Courts of Appeal have uniformly held section 664.6 requires the signature of all parties against whom the agreement is sought to be enforced *and* the parties seeking to enforce the agreement. (See *Harris v. Rudin, Richman & Appel* (1999) 74 Cal.App.4th 299, 305; *Sully–Miller Contracting Co. v. Gledson/Cashman Construction, Inc.* (2002) 103 Cal.App.4th 30, 37; *Gauss v. GAF Corp.* (2002) 103 Cal.App.4th 1110, 1116–1121; *Critzer v. Enos* (2010) 187 Cal.App.4th 1242, 1255–1258.)

---

to the Family Code, an action brought pursuant to the Probate Code, or a matter that is being adjudicated in a juvenile court or a dependency court.

"(d) In addition to any available civil remedies, an attorney who signs a writing on behalf of a party pursuant to subdivision (b) without the party's express authorization shall, absent good cause, be subject to professional discipline."

Because the writing prepared at the mediation was signed on behalf of C&C and its insurer only "by and through their attorney," the $300,000 credit provision was not enforceable under section 664.6.  (See *Levy, supra,* 10 Cal.4th at p. 586.)  This does not mean the provision cannot be enforced under alternative procedures, but it does mean the trial court was not authorized to incorporate the provision into the judgment under the summary procedure established by section 664.6.  (See *Levy,* at p. 586 & fn. 5 [holding agreement was not enforceable under section 664.6, but observing alternative procedures existed for enforcement, including a separate suit in equity].)  The trial court did not err.

3.   ***The Sublease's Attorney Fee Provision Did Not Authorize Attorney Fees for WAW's Negligence Claim***

WAW moved for contractual attorney fees under sections 1021, 1032, and 1033.5 based on the following provision in its sublease with C&C:

> "8.  Attorneys' Fees.  If there is any legal action or proceeding between Sublandlord and Subtenant to enforce any provision of this Sublease or to protect or establish any right or remedy of either Sublandlord or Subtenant hereunder, the non-prevailing party to such action or proceeding will pay to the prevailing party all costs and expenses, including reasonable attorneys' fees incurred by such prevailing party in such action or proceeding and in any appearance in connection therewith, and if the prevailing party recovers a judgment in any such action, proceeding or appeal, such costs, expenses and attorney's fees will be

23

determined by the court or arbitration panel handling the proceeding and will be included in and as a part of the judgment."

The parties agree a prevailing party is eligible for attorney fees under this provision for a legal action brought "to enforce any provision of this Sublease" (the Enforce Clause) or "to protect or establish any right or remedy of either Sublandlord or Subtenant hereunder" (the Protect or Establish Clause).

The trial court granted WAW's motion for attorney fees, concluding the Protect or Establish Clause's "use of the word 'any' to describe 'right or remedy' " was "broad enough to encompass tort claims." We conclude the trial court erred.

Attorney fees are recoverable costs under sections 1021 and 1032 if authorized by contract. (§ 1033.5, subd. (a)(10).) Case law interpreting section 1021 has consistently recognized "parties may validly agree that the prevailing party will be awarded attorney fees incurred in any litigation between themselves, whether such litigation sounds in tort or in contract." (*Xuereb v. Marcus & Millichap, Inc.* (1992) 3 Cal.App.4th 1338, 1341.) "[T]he test is not whether the cause of action sounds in tort or contract. Instead, the sole question is the intent of the parties: did they intend to authorize the prevailing party to recover its attorney fees for a tort cause of action." (*Allstate Ins. Co. v. Loo* (1996) 46 Cal.App.4th 1794, 1798.)

To answer this question, "we apply the ordinary rules of contract interpretation." (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 608.) " 'Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. [Citation.] Such intent is to be inferred, if possible, solely from the written provisions of the contract.

24

[Citation.] The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage" [citation], controls judicial interpretation. [Citation.] Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning.' " (*Ibid.*)

The plain words of the Enforce Clause make the parties' intent clear: The prevailing party would be entitled to attorney fees for a claim brought "to enforce any *provision of this Sublease*." (Italics added.) There is no reasonable construction of this clause under which the identification of a "provision of this Sublease" is not a prerequisite to an award of attorney fees. Because WAW does not, and cannot, identify a provision of the sublease that its action enforced, WAW was not entitled to attorney fees under the Enforce Clause. (See *Loube v. Loube* (1998) 64 Cal.App.4th 421, 430 [attorney fee provision "providing for the payment of fees for an action brought to enforce the terms of the parties' agreement, cannot be read as a contractual agreement to award fees in an action brought for legal malpractice"].)

WAW's reliance on *Lockton v. O'Rourke* (2010) 184 Cal.App.4th 1051 (*Lockton*) is misplaced. The plaintiff in *Lockton* sued his former attorneys (an individual attorney and the attorney's law firm) for contract and tort causes of action based on their alleged failure to preserve the plaintiff's claims in an underlying lawsuit. (*Id.* at p. 1059.) After the attorneys successfully demurred, they moved for attorney fees under the fee clause in their retainer agreement. (*Id.* at pp. 1070–1071.) The trial court denied fees for the individual attorney on the

25

ground that he was not a signatory to the retainer agreement, and thus could not be held liable for breach of contract. (*Id.* at p. 1073.) The *Lockton* court reversed, concluding "the contract and tort claims were inextricably intertwined," and the attorney was entitled to fees on all claims under Civil Code section 1717. (*Lockton*, at p. 1073 [observing, "it is settled," under Civil Code section 1717's mutuality principle, "that a defendant who is not a signatory to the contract with the fee clause is entitled to fees when sued on the contract 'as if he were a party to it, when a plaintiff would clearly be entitled to attorney's fees should he prevail in enforcing the contractual obligation' "].)

The *Lockton* court concluded the contract and tort claims against the law firm were likewise inextricably intertwined; however, because the law firm effectively represented itself in the litigation, it could not recover fees under Civil Code section 1717 and our Supreme Court's holding in *Trope v. Katz* (1995) 11 Cal.4th 274, 277 (*Trope*).[11] (*Lockton, supra,* 184 Cal.App.4th at pp. 1074–1075.) Nevertheless, the *Lockton* court held the attorney fee provision was sufficiently broad to allow recovery of fees under section 1021. The fee provision in the retainer agreement provided: " 'The prevailing party in any action or

---

[11] Civil Code section 1717, subdivision (a) authorizes the recovery of attorney fees "[i]n any action on a contract, where the contract specifically provides that attorney's fees and costs, which are *incurred* to enforce that contract, shall be awarded either to one of the parties or to the prevailing party." (Italics added.) In *Trope*, our Supreme Court held "an attorney litigating in propria persona cannot be said to 'incur' compensation for his time and his lost business opportunities" and, thus, cannot recover attorney fees under Civil Code section 1717. (*Trope, supra,* 11 Cal.4th at p. 280.)

26

proceeding to enforce any provision of this agreement will be awarded attorneys' fees and costs incurred in that action or proceeding, *including, without limitation, the value of the time spent by QEUO&H attorneys to prosecute or defend such an action (calculated at the hourly rate(s) then normally charged by QEUO & H to clients which it represents on an hourly basis) . . . .'* " (*Lockton,* at p. 1075.) The *Lockton* court held this italicized language established the plaintiff's intent to pay the firm "for the value of the time spent by attorneys in that firm to prosecute or defend an action based on the attorney-client relationship created by the retainer agreement," even though the firm effectively represented itself in propria persona, and this was sufficient to allow the recovery of fees for the intertwined contract and tort claims under section 1021. (*Lockton,* at p. 1078.)

Here, WAW dismissed its contract claim and C&C admitted liability on WAW's tort claim only. WAW does not contend its tort claim was inextricably intertwined with its dismissed contract claim. *Lockton* is inapposite.

WAW also was not entitled to attorney fees under the Protect or Establish Clause. Focusing on the word " 'any' to describe the 'right or remedy' " the trial court concluded the clause was "broad enough to encompass tort claims." But this construction ignores critical language in the clause specifically limiting the recovery of attorney fees to claims brought "to protect or establish *any right or remedy* of either Sublandlord or Subtenant *hereunder.*" (Italics added.) Like the Enforce Clause's reference to "any *provision of this Sublease*" (italics added), the Protect or Establish Clause's use of the term "hereunder" plainly limits recovery to an action that protects or establishes a right

27

*under the sublease*—not any right that possibly can be established in a legal action.[12]  The trial court's construction is inconsistent with the plain language of the Protect or Establish Clause.

WAW contends its action did protect or establish a right or remedy under the sublease because the "lost profits" it won "can be a form of 'special' or 'consequential' damages."  However, the provision of the sublease WAW relies upon does not provide a right to special or consequential damages—it expressly *precludes* those damages as an available remedy.

Section 16.5 of the sublease provides in relevant part: "Subtenant hereby agrees that Sublandlord *shall not* be liable for injury or damage to Subtenant's business or any loss of income arising therefrom or for damage to the aircraft . . . . Notwithstanding any provision in the Lease to the contrary, in *no event* shall Sublandlord be liable to Subtenant for special, incidental, consequential or punitive damages no matter how occurring."  (Italics added.)  Notwithstanding this provision, WAW's tort claim allowed it to recover damages it manifestly

---

[12]  WAW suggests "hereunder" refers to the terms "Sublandlord or Subtenant," and argues the fee clause "thus authorizes the award of fees to WAW because it is one of the parties 'hereunder.'"  This is not a reasonable construction of the clause.  "Sublandlord" and "Subtenant" are defined terms that specifically refer to the parties to the sublease—C&C and WAW, respectively.  Because the definitions of these terms already establish that C&C and WAW are parties under the sublease, WAW's proposed construction would render the term "hereunder" surplusage, in violation of basic rules of contract construction.  (*Farmers Ins. Exchange v. Knopp* (1996) 50 Cal.App.4th 1415, 1421 [contracts are to be construed to avoid rendering terms surplusage].)

could *not* have recovered under the terms of the sublease. The trial court erred in awarding WAW attorney fees under the sublease.  (See *Exxess Electronixx v. Heger Realty Corp.* (1998) 64 Cal.App.4th 698, 710 [award of attorneys fees cannot be sustained on the theory that the tort claims were brought to " 'enforce the terms' " of the lease]; *DeMirjian v. Ideal Heating Corp.* (1949) 91 Cal.App.2d 905, 909–910 [lease authorizing award of attorney fees in an action " 'to enforce Lessors' rights hereunder' " did not support fee award for tort claim].)

## DISPOSITION

The judgment is affirmed.  The order awarding attorney fees is reversed.  The parties shall bear their own costs.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, J.

We concur:

EDMON, P. J.

LAVIN, J.